Francis M. MARLEY

v.

The UNITED STATES.

No. 3–60.

United States Court of Claims.

July 20, 1967.

I. H. Wachtel and James D. Finn, Jr., Washington, D. C., for plaintiff. I. H. Wachtel, Washington, D. C., attorney of record. Sheldon I. Matzkin, Washington, D. C., of counsel.

Manfred J. Schmidt, Washington, D. C., with whom was Asst. Atty. Gen. Barefoot Sanders, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

COWEN, Chief Judge.

Plaintiff, Francis M. Marley, purchased the following at a bankruptcy sale authorized and approved by the United States District Court for the Northern District of Ohio:

*Claim I*—"Claim of bankrupt against the United States of America for

damages resulting from the termination of Department of Army Contract No. DA–36–038–507–ORD–1588, for which a claim in the sum of One Hundred Thousand Dollars ($100,000.00) has been filed;"

*Claim II*—"Claim of bankrupt against the United States of America for money due the bankrupt in connection with the Department of Army Contract No. DA–11–070–ORD–8071, in the sum of Fifty-two Thousand and Fifty Dollars ($52,050.00)."

Paralleling these claims are two of the causes of action contained in the petition before this court and the Government contract involved separately in each cause of action. Throughout this opinion, Claim I purchased by plaintiff Marley relates to Cause of Action I and the contract sued upon therein (which, for the sake of convenience, will be referred to as Contract I); likewise, Claim II purchased by plaintiff Marley relates to Cause of Action II and Contract II.

### The Underlying Contracts

*Contract I:*

On April 6, 1956, Firth Machine & Tool, Inc. (the eventual bankrupt) entered into a contract with the Government for the manufacture of 17,874 initiators[1] at a unit price of $6.75. As a result of Firth's alleged failure to meet a specified delivery schedule, the contracting officer issued a letter on February 18, 1957, terminating the contract for default. Firth was also notified that the initiators required to complete the contract would be procured on the open market and that Firth would be held liable for any excess costs incurred by the Government.

The Government thereafter awarded a contract for 17,007 initiators at a unit price of $16.71 to Federal Industries, Inc. Allowance having been made for a change in packaging requirements, a demand for excess reprocurement costs in the amount of $152,231.24 was made against Firth on July 30, 1957, and increased on November 29, 1957, to $159,238.24.

Firth appealed to the Armed Services Board of Contract Appeals which, on July 30, 1959, upheld the termination for default but reversed the assessment of excess reprocurement costs, holding that the Government had failed to mitigate damages. Although the Board did not direct him to do so, the contracting officer thereafter reassessed damages in the amount of $93,029.76. By letter of January 29, 1960, demand was made for this amount.

*Contract II:*

On or about June 30, 1952, Firth was awarded Contract No. DA–11–070–ORD–8071 by the Department of the Army. In September of 1957 and after complete performance of the contract, the parties agreed to an equitable adjustment, increasing the price payable to Firth by $59,500 (subject to certain offsets by the Government, leaving a net amount of $45,434.33).

The modification agreement giving rise to the equitable adjustment contained this paragraph:

The Government and the Contractor agree that the Government shall have a prior lien for the said sum of $59,500.00 referred to above on account of a claim or claims by the Government against the Contractor on this or other contracts; and the Contractor waives any right of assignment hereof.

*Firth's Bankruptcy and the Commencement of Suit in the Court of Claims*

On December 4, 1957, an involuntary petition in bankruptcy against Firth was filed in the United States District Court for the Northern District of Ohio. This occurred: (1) nearly 10 months after the contracting officer had terminated Contract I for default and shortly after the assessment of excess reprocurement

---

I. An initiator is a cartridge-actuated device to provide the initial impetus to the seat ejection mechanism of military aircraft.

costs in the amount of $159,238.24; (2) while appeal proceedings relative to the contracting officer's decision were pending before the Armed Services Board of Contract Appeals; and (3) approximately 3 months after the execution of the modification agreement fixing the equitable adjustment under Contract II.

On April 14, 1958, while the appeal before the Armed Services Board of Contract Appeals was still pending, the Government filed a priority proof of claim in the bankruptcy proceedings for the full amount of the excess reprocurement costs on Contract I.

Then, on July 30, 1959, the Armed Services Board of Contract Appeals rendered its decision affirming the termination for default of Contract I, but reversing the assessment of reprocurement costs as being excessive.

Approximately 6 months after this decision, Firth's receiver (who was also appointed trustee in bankruptcy) filed a petition in this court, alleging, among other things:

Cause of Action I—That "the decision of the Board holding that the termination for default was proper was not supported by the evidence and was arbitrary, capricious and disregarded substantial evidence which established that Firth's failure to meet its delivery schedule was due to factors beyond its control and without its fault or negligence * * *."

That the termination "should have been considered to have been for the convenience of the defendant," and that the receiver is entitled to relief of not more than $100,000, representing Firth's costs in performing Contract I.

Cause of Action II—That, pursuant to the modification agreement of September 9, 1957, the Government withheld the $45,434.33 owing Firth under Contract II as a setoff against the excessive reprocurement costs allegedly due under Contract I.

That Firth's receiver should recover this money since the Government is not legally entitled to retain it.

In its answer[2] the Government alleged that the termination of Firth's contract for default in failing to meet the contract delivery schedules "was supported by substantial evidence and was in no way arbitrary or capricious and that Firth's failure to meet the mandatory delivery schedules was not due to factors beyond its control or without its fault or negligence." Relative to Cause of Action II, the Government alleged that "it was legally and equitably justified in setting off the sum of $45,434.33 due under [Contract II] against the claim which the Government had for excess costs of reprocurement resulting from Firth's default of [Contract I]."

The Government also interposed a counterclaim against the receiver, claiming excess reprocurement costs of $93,-029.06 and alleging that the withholding of $45,434.33 due Firth under Contract II was proper.[3]

*Plaintiff Marley's Purchase of Firth's Claims*

On June 16, 1964, Firth's trustee filed an application to the district court for the marshaling of liens and sale of the bankrupt's claims against the United States.

---

2. As mentioned earlier, the contracting officer undertook to reassess damages under Contract I, following the decision of the Armed Services Board of Contract Appeals. Accordingly, demand was made on Firth on January 29, 1960, for payment in the amount of $93,029.06 as excess reprocurement costs under Contract I. Thereafter, on February 17, 1960, the Government filed a motion in the bankruptcy court to be dismissed from the bankruptcy proceedings as a party therein. The motion was granted on April 20, and on June 15, 1960, the Government interposed its answer to the receiver's petition in this court.

3. On June 20, 1960, the Government filed in the bankruptcy proceedings an "amended contingent proof of claim" for $92,889.76, representing the sum of $93,029.06, less certain adjustments and credits.

By order of June 30, 1964, the district court authorized the trustee to sell the personal property set forth in the application "free and clear of liens." Since the United States was in default of any answer or other pleading to the application by the trustee, it was declared that the United States be "forever barred from asserting any lien against the property hereinabove described or the proceeds of the sale thereof."

A notice of public sale was mailed to all interested parties and, on February 3, 1965, Francis M. Marley purchased Firth's claims against the United States for $4,000. Following a confirmation of the sale, the trustee executed and delivered a bill of sale to Marley on February 11, 1965, wherein it was stated that the said property was purchased "free and clear from the liens and claims" of the United States. This court entered an order on March 26, 1965, substituting Francis M. Marley as sole party plaintiff.

Plaintiff Marley has moved for an order (1) striking the Government's counterclaim insofar as the $45,434.33 due under Contract II is claimed to have been rightfully withheld in partial satisfaction of the Government's alleged damages resulting from the termination of Contract I, or alternatively, (2) granting summary judgment on Cause of Action II.

Relying first on the bankruptcy sale, plaintiff argues that he owns Claim II for $45,434.33 "free and clear of any liens, claims, or defenses the defendant may have had against the bankrupt prior to the closing of the bankruptcy proceedings, or that the government may yet assert against the bankrupt." The sale, it is further contended, explicitly extinguished the Government's right to set off its unliquidated claim under Contract I against the liquidated amount owing by virtue of Contract II.

We are of the opinion that the plaintiff's motion should be denied.

When the involuntary petition in bankruptcy was filed against Firth, the Government was still claiming the right to offset the money due under Contract II against the reprocurement costs assessed in connection with Contract I.[4] The justification for this action was the parties' contractual understanding contained in the supplemental agreement to Contract II. It was there agreed that the Government would have a prior lien on the amount to which Firth was entitled under Contract II "on account of a claim or claims by the Government against the Contractor on this or other contracts." It may be inferred that this language was intended to embrace the damages claimed by the United States because of the termination of Contract I since the first demand against Firth for reprocurement costs was made on July 30, 1957—less than 2 months prior to the execution of the supplemental agreement on September 9, 1957. Nearly 19 months later, the Armed Services Board of Contract Appeals affirmed the termination for default of Contract I, but found the assessment of damages to be excessive. Firth's trustee, then designated as receiver in bankruptcy, subsequently commenced an action in this court, seeking to overturn the decision of the Board and also praying for affirmative relief of no more than $100,000. Before the Government filed its answer, the contracting officer reassessed damages under Contract I.

Answering the trustee's petition, the Government asserted the correctness of the Board's conclusion as well as the legality of withholding the money due Firth under Contract II as an offset. It also interposed a counterclaim, alleging entitlement to the reassessed reprocurement costs.

Firth's trustee having instituted an action against the United States, there be-

---

4. On page 10 of plaintiff Marley's initial brief, it was stated that "clearly, the government never 'reduced' its unliquidated claim [under Contract I] to the stature of a lien; *at best*, all it might have possessed was a right to temporarily withhold monies due [under Contract II] pending adjudication or liquidation of [Contract I]."

came operative a statutory provision conferring jurisdiction on the Court of Claims "to render judgment upon any set-off or demand by the United States against any plaintiff in such court." 28 U.S.C. § 1503 (1964 ed.); see also 28 U.S.C. § 2508 (1964 ed.). Judge Littleton, speaking for this court in Frantz Equip. Co. v. United States, 105 F.Supp. 490, 495, 122 Ct.Cl. 622, 630 (1952), indicated the approach we should take in cases involving the right of the United States to assert counterclaims and claims for offsets:

> We are not at liberty, by interpretation, to limit or restrict the plain and broad terms of the statute relating to the right of the Government to assert counterclaims and to the jurisdiction of this court to hear and determine such claims.

Such insight into the proper application of section 1503 finds expression in the Supreme Court's earlier articulation of the purpose underlying the section: "to permit the Government, when sued in the Court of Claims, to have determined in a single suit all questions which involved mutual obligations between the government and a claimant against it." Cherry Cotton Mills, Inc. v. United States, 327 U.S. 536, 539, 66 S.Ct. 729, 730, 90 L.Ed. 835 (1946).

Prior to the enactment of section 1503, a predecessor provision defined our jurisdiction as extending to "[a]ll setoffs, counterclaims, claims for damages, *whether liquidated or unliquidated*, or other demands whatsoever on the part of the Government of the United States against any claimant against the Government in said court * * *." [Emphasis supplied.] 28 U.S.C. § 250(2) (1946 ed.). Reference to this parent section reveals that the unliquidated nature of the Government's claim against Firth under Contract I does not operate as a bar to its being asserted as a setoff against the sum owing Firth under Contract II. For, as Judge Littleton stated in the *Frantz* decision, supra, 105 F. Supp. at 494, 122 Ct.Cl. at 628 "Section 1503 * * * made no change in the substance and effect of this [earlier] jurisdictional provision, * * *."

In an affidavit dated October 13, 1965, and annexed to defendant's cross-motion for summary judgment as Exhibit 5, Firth's referee in bankruptcy recited that the Government's claim for excess reprocurement costs under Contract I was neither allowed, disallowed, nor adjudicated in bankruptcy since it was "contingent and * * * never liquidated." The record offers little assistance concerning the bankrupt's liquidated claim for $45,434.33, except for the trustee's commencement of an action in the Court of Claims to recover this amount. The trustee thereby recognized that this court, rather than the bankruptcy court, had jurisdiction to determine the rights of the parties under Contract II. 28 U.S.C. § 1346(a) (2) and § 1491. Similarly, the filing of his petition in this court for recovery on Claim I was an acknowledgment that this the proper tribunal for determining whether Firth's contract was wrongfully terminated by the Government.

Therefore, when the trustee undertook to sell Firth's assets, the following factors were in existence: (1) a claim by the United States for excess reprocurement costs which had not been, and could not have been, adjudicated in bankruptcy; (2) a suit properly instituted by Firth's trustee in the Court of Claims for the determination of Firth's right of recovery under Contracts I and II; (3) a counterclaim, correctly interposed by the Government in the Court of Claims action, for the recovery of the excess reprocurement costs; and (4) an assertion by the Government of its right, discussed earlier, to set off the amount of this counterclaim against the trustee's claim for $45,434.33 under Contract II.

To reiterate, plaintiff Marley's purchase at the bankruptcy sale consisted of:

> *Claim of bankrupt* against the United States of America for damages resulting from the termination of [Contract I], *for which a claim* in the sum of One

Hundred Thousand Dollars ($100,000.-00) *has been filed;*

*Claim of bankrupt* against the United States of America for money due the bankrupt in connection with [Contract II], in the sum of Fifty-two Thousand and Fifty Dollars ($52,050.00) [Emphasis supplied].

Both of these claims had been sued upon in the Court of Claims—a suit wherein, as plaintiff Marley was well aware, the United States had asserted its right of setoff. Although the issues in the case had already been joined, the plaintiff would have us hold that he acquired rights greater than those of the bankrupt whose claim he purchased. For several reasons, we cannot so hold.

■ The trustee, in his capacity as seller of Firth's two claims against the United States, could convey only such right, title, and interest as was vested in him as a result of the bankruptcy proceedings. Hagan v. Gardner, 283 F.2d 643, 646 (9th Cir. 1960). Plaintiff Marley, as a purchaser subject to the "caveat emptor" admonition, could acquire no greater right, title, or interest than that of the trustee. Roby v. Colehour, 146 U.S. 153, 161, 13 S.Ct. 47, 36 L.Ed. 922 (1892); Levy v. Dossin's Food Products, 72 F.Supp. 855, 860 (W.D.Mich. 1947); Handlan v. Bennett, 51 F.2d 21, 24 (4th Cir. 1931); Hall v. McGehee, 37 F.2d 854, 855 (5th Cir. 1930), Cert. denied, 281 U.S. 747, 50 S.Ct. 351, 74 L.Ed. 1159; In re Macklem, 28 F.2d 417, 418 (D.Md.1928).

■ That the trustee and plaintiff Marley were cognizant of the posture of the Court of Claims action and the effect of the Government's offset against Claim II is evidenced by the application to sell Firth's property. In this document, the trustee noted that:

[T]he files in the [Court of Claims action] were reviewed by Attorney Gilbert A. Cuneo of the firm of Cummings and Sellers of Washington, D.C., whose report states that they are of the opinion that (a) Claim No. I cannot be maintained because of lack of

evidence, and (b) any monies due to bankrupt's estate on Claim No. II are offset by the damages which are claimed by the United States of America in said suit.

Knowing this, the trustee sold the two claims for a total price of $4,000—a figure representing less than 10 percent of the face value of Claim II, yet more than the combined appraised value of both claims. It is true that the two claims were sold, according to the Order of Sale, "free and clear of liens." But this does not mean that they were sold free and clear of the Government's already asserted right of setoff.

A "setoff" and a "lien" connote independent concepts, governed by distinct legal principles. In Motto v. United States, 360 F.2d 643, 645, 175 Ct.Cl. 862, 865 (1966), this court had the occasion to define setoff as pertaining to "situations where both plaintiff and defendant have independent causes of action maintainable against each other in separate actions which can be mutually deducted whenever either one brings a suit against the other." See also Flying Tiger Line, Inc. v. United States, 170 F.Supp. 422, 145 Ct.Cl. 1 (1959). On the other hand, a lien has been construed as "a charge or encumbrance upon property to secure the payment or performance of a debt, duty, or other obligation. It is distinct from the obligation which it secures." United States v. Phillips, 267 F.2d 374, 377 (5th Cir. 1959); see also United States v. Kentucky Home Mutual Life Ins. Co., 292 F.2d 39, 42 (6th Cir. 1961), cert. denied, 369 U.S. 803, 82 S.Ct. 642, 7 L.Ed.2d 550 (1962); United States v. Salerno, 222 F.Supp. 664, 668 (D.Nev.1963).

What the United States possessed here was not a "lien" upon the amount claimed by plaintiff Marley in his second cause of action. When it was sued by Firth's trustee in this court, the Government had a statutory right of *setoff*—the exercise of which was a fact known by plaintiff Marley at the time of the bankruptcy sale. And nowhere in the bankruptcy papers was it recited that Claim II was sold free and clear of this setoff.

Even if we were to hold that the supplemental agreement executed on September 9, 1957, between Firth and the Government gave rise to a contractual lien, a contrary result would not be required. It will be recalled that the agreement antedated the trustee's action in the Court of Claims. A sale which extinguished such a lien would not alter the status of the pending lawsuit by depriving the United States of its rights under 28 U.S.C. § 1503.

▋▋ When a bankrupt's assets are sold free and clear of liens, the rights of the lienholder are transferred to the proceeds of the sale. Jones v. Springer, 226 U.S. 148, 157, 33 S.Ct. 64, 57 L.Ed. 161 (1912); Drybrough v. Ware, 111 F.2d 548, 550 (6th Cir. 1940); Fierman v. Seward Nat'l Bank, 37 F.2d 11, 13 (2d Cir. 1930). Likewise, "it is equally well settled that [the power to sell free of liens] should not be exercised unless it is reasonably clear that the property will bring more than the encumbrances and expenses of sale." In re Beardsley, 38 F.Supp. 799, 802 (D.Md.1941); Hoehn v. McIntosh, 110 F.2d 199, 202 (6th Cir. 1940). We need only point out that (1) the United States was precluded from asserting any rights in the proceeds of the bankruptcy sale, and (2) the sale of both claims engendered only $4,000 as against the Government's claim of $92,889.76 for reassessed reprocurement costs resulting from the termination of Contract I.

▋ On the whole record, we conclude that the bankruptcy court did not authorize the sale of Claim II free and clear of the setoff asserted by the Government against Firth's trustee in Court of Claims Action No. 3–60, and that plaintiff Marley purchased the claim subject to defendant's right to set off any amount it may recover on its counterclaim with respect to Claim I against the amount due on Claim II. Accordingly, plaintiff Marley's motion to strike the defendant's counterclaim or, in the alternative, for summary judgment on the second cause of action is denied.

In view of certain pretrial proceedings had in this action, decision on defendant's cross-motion for summary judgment is deferred. The case is returned to the trial commissioner for further proceedings in accordance with our Rules 94–100, as set forth in Chapter. XVIII, captioned "Wunderlich Act Reviews," effective June 1, 1967.