M. Rudolph PREUSS, Trustee in Bankruptcy of Estate of Crosby-Teletronics Corporation

v.

The UNITED STATES.

No. 177–64.

United States Court of Claims.

July 16, 1969.

I. H. Wachtel, Washington, D. C., attorney of record for plaintiff.

Russell W. Koskinen, Washington, D. C., with whom was Asst. Atty. Gen., William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON THE THIRD CAUSE OF ACTION AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

SKELTON, Judge.

The plaintiff alleged eight causes of action in this case in the beginning, and the defendant asserted three counterclaims. However, on November 1, 1968, the court granted defendant's motion for summary judgment as to plaintiff's first and eighth causes of action, and the parties have agreed that the second, fourth, fifth, and seventh causes of action and defendant's first counterclaim should be dismissed, as shown by stipulations filed with the court, and, as shown by the stipulations, the parties have agreed that plaintiff was entitled to recover $721.92 on its sixth cause of action, and defendant was entitled to recover $765.73 on its second counterclaim, and that judgment was to be entered accordingly. This leaves only the plaintiff's third cause of

action and the defendant's third counterclaim to be decided in this case.

The plaintiff's claim is based on the following events. Teletronics Laboratory, Inc., was awarded contract No. NObsr–75567 on September 29, 1958, by the Department of the Navy Bureau of Ships for the production of 31 AN/FRT–17 radio transmitting sets with appurtenant parts and manuals for the sum of $294,624. These sets were to be delivered in accordance with a schedule between June 29, 1960, and October 29, 1960. A second contract No. NObsr–75568 for the production of 29 additional sets of the same item was awarded to the same company on October 10, 1958, for the total sum of $273,180. These additional sets were to be delivered as per an agreed schedule between June 1960, and September 1960. Teletronics Laboratory, Inc., merged with Crosby-Teletronics Corporation on May 17, 1960, and transferred all of its assets to the latter company. The government and the two corporations entered into a novation agreement on May 20, 1960, whereby Crosby-Teletronics Corporation was substituted for Teletronics Laboratory, Inc., as the contractor in the two above-mentioned contracts. This company filed a petition for reorganization in bankruptcy on November 14, 1961, and on June 27, 1962, it and its subsidiary, Crosby Electronics, Inc., were adjudged bankrupt. At that time, M. Rudolph Preuss was appointed trustee in bankruptcy of the estate of Crosby-Teletronics Corporation and, thereafter, filed this suit as such trustee.

In this suit, as will be discussed in more detail below, the plaintiff claims that it is entitled to $275,000 as an equitable adjustment and/or breach of contract damages because of the unsuitable character of government furnished property, namely, microfilm, that was furnished to it by the government as required by the contracts, and which caused it to incur this amount of additional expense and which also caused its eventual bankruptcy. The plaintiff also says that the defective government furnished microfilm excused its delay in performance of the contracts and, therefore, their termination by the government was wrongful.

The government, on the other hand, says that the microfilm was suitable for the purposes for which it was furnished, and denies that it caused plaintiff's delay in performance or the $275,000 extra expense claimed by plaintiff, and that it caused plaintiff's bankruptcy. It filed a counterclaim for $370,713.30 for the recovery of unliquidated progress payments made to plaintiff before termination.

The provisions of both contracts were the same, except that the first contract required the plaintiff to deliver a pre-production model by September 29, 1959. Both contracts contained standard progress payment, changes, default, disputes, and general provisions clauses. The specification, special provision and government furnished property clauses pertinent to this case are as follows:

PRODUCTION EQUIPMENT: Item 1 shall be in accordance with Bureau of Ships Contract Specification SHIPS—T—3017, dated 5 March 1958 except that paragraphs 3.2, 3.3, 3.4, 3.5 and 3.6 on page 3 of said specification are deleted in their entirety.

The AN/FRT–17 ( ) Radio Transmitting Set covered by Specification SHIPS—T—3017 shall duplicate the model which will be furnished to the Contractor by the Government—wear, tear, damage and deterioration excepted. All parts and subassemblies of the AN/FRT–17 ( ) Radio Transmitting Set shall be physically, electrically and mechanically interchangeable with the corresponding parts and subassemblies of the model. In the event of any conflict or inconsistency between the foregoing requirements for duplication and interchangeability and the performance or other requirements of Specification SHIPS—T—3017, the latter shall govern except that in the event of any conflict or inconsistency between the foregoing requirements for duplication and inter-

changeability and the requirements of Specification MIL—E—16400, the former shall govern. The Contractor shall determine for itself whether such conflicts or inconsistencies exist and shall immediately upon discovering any such conflict or inconsistency notify the Chief of the Bureau of Ships, Code 834, thereof, giving full details. The notification shall be forwarded to the Bureau prior to any construction of the preproduction equipment to be submitted hereunder to the Government for testing. The notification shall also include a request for approval for the use of any non-standard parts which may be required to meet the foregoing requirements for duplication and interchangeability.

GOVERNMENT FURNISHED PROPERTY: Upon Contractor's written request to the Chief, Bureau of Ships, via the cognizant Naval Inspector, the Government will furnish the following:

1. One (1) NA/FRT–17 Radio Transmitting Set (To be requested from Code 881c)

2. Two (2) Technical Manuals NAVSHIPS 91963 (with existing revisions, if any) (To be requested from Code 993)

3. One (1) set of Microfilm of Manufacturing Drawings (To be requested from Code 991)

4. A set of offset negatives of Technical Manual NAVSHIPS 91963 (with existing revisions, if any) will be supplied to the Contractor for 60 days to facilitate printing the required Technical Manuals. These negatives (with existing revisions, if any) shall be requested from the Bureau of Ships, Code 248, allowing approximately 30 days for delivery. The request shall reference this contract and state that it provides for the use of the negatives as Government Furnished Property. The request shall also specify when the Contractor desires the 60 day period to begin.

These Government furnished items were accepted by the Government pursuant to the contract(s) under which they were procured by and delivered to the Government, but the specifications and other requirements of said contract(s) are not identical to the requirements of this contract. These Government furnished items are furnished for information and assistance to the Contractor with respect to the general nature of equipments and repair parts to be delivered under the contract and for the use of the contractor in meeting the requirements of this contract respecting duplication and interchangeability as set forth under the heading "Production Equipment". In addition, NAVSHIPS 91963 (Technical Manuals) and offset negatives are furnished for the use of the Contractor in meeting the requirements of this contract with respect to Technical Manuals (NAVSHIPS 91963), Revisions and Photographic Negatives. The Government does not represent that the Government furnished AN/FRT–17 Radio Transmitting Set meets the requirements of this contract in every respect, nor does it represent that the microfilm is complete or legible in whole or in any particular part or that the drawings from which the microfilm was made are complete and accurate and free from omissions, errors, inconsistencies or other defects and it does not represent that equipments or repair parts made in accordance with the Government furnished AN/FRT–17 Radio Transmitting Set and/or Technical Manuals and/or Microfilm of Manufacturing Drawings will meet the performance or other requirements of this contract including the specifications referenced directly or indirectly herein.

32. GOVERNMENT–FURNISHED PROPERTY: (a) The Government shall deliver to the Contractor, for use in connection with and under the terms of this contract, the property described in the Schedule or specifications, together with such related data and information as the Contractor may request and as may reasonably be required for the intended use of such property (hereinafter referred to as "Government-fur-

nished Property"). The delivery or performance dates for the supplies or services to be furnished by the Contractor under this contract are based upon the expectation that Government-furnished Property suitable for use will be delivered to the Contractor at the time stated in the Schedule or, if not so stated, in sufficient time to enable the Contractor to meet such delivery or performance dates. In the event that Government-furnished Property is not delivered to the Contractor by such time or times, the Contracting Officer shall, upon written request made by the Contractor make a determination of the delay occasioned the Contractor thereby, and shall equitably adjust the delivery or performance dates or the contract price, or both, and any other contractual provision affected by such delay, in accordance with the procedures provided for in the clause of this contract entitled "Changes." In the event the Government-furnished Property is received by the Contractor in a condition not suitable for the intended use the Contractor shall, upon receipt thereof, notify the Contracting Officer of such fact and, as directed by the Contracting Officer, either (i) return such property at the Government's expense or otherwise dispose of the property, or (ii) effect repairs or modifications. Upon the completion of (i) or (ii) above, the Contracting Officer upon written request of the Contractor shall equitably adjust the delivery or performance date for the contract price, or both, and any other contractual provision affected by the rejection or disposition, or the repair or modification, in accordance with the procedures provided for in the clause of this contract entitled "Changes." The foregoing provisions for adjustment are exclusive and the Government shall not be liable to suit for breach of contract by reason of any delay in delivery of Government-furnished Property or delivery of such property in a condition not suitable for its intended use.

As is indicated in the above-quoted provisions of the contracts, the government agreed to furnish to plaintiff certain microfilm of manufacturing drawings for the information and assistance of the plaintiff in duplicating the model of the transmitting set also furnished to plaintiff by the government. All parts of the set were required to be physically, electrically, and mechanically interchangeable with the corresponding parts and sub-assemblies of the model. The contracts provided that if the government furnished property is received by the contractor in a condition not suitable for the intended use, the contractor shall give notice to the contracting officer of such fact and as directed by the latter, either return the property or make repairs or changes thereto. In such event, upon request of the contractor, the contracting officer was required to equitably adjust the performance date or the contract price, or both, in accordance with the "changes" clause. This relief was exclusive and the government was not to be sued for breach of contract for any of such deficiencies.

The microfilm was delivered to the plaintiff by the government, but plaintiff complained to the contracting officer that 100 prints made by two different firms from the microfilm were not legible and that only 1,500 frames out of a total of 2,544 were useable. The plaintiff advised defendant that 254 frames were illegible. The defendant sent plaintiff another set of microfilm, but prints made from it were of the same quality. The plaintiff says that it had to complete the drawings that were illegible by reverse engineering from the model furnished to it. In any event, plaintiff advised defendant on June 29, 1959, that it had completed marking all the drawings from the microfilm and was ready to proceed with the production of the sets.

The plaintiff was required to submit the preproduction model on September 29, 1959, but it was not submitted until September 26, 1960, almost one year late. On October 4, 1960, the plaintiff asked for a new delivery schedule which would allow final delivery of the sets 240 days

after September 26, 1960, the date of the approval of the preproduction model. This was finally approved by the contracting officer on January 23, 1961, without excusing plaintiff for its delays and without waiving any of the rights of the government.

The plaintiff stopped work on the contracts on August 4, 1961, because of financial difficulties. On August 23, 1961, the contracting officer notified plaintiff its failure to make progress was endangering the performance of the contract and allowed it ten days to show cause why it should not be terminated. The plaintiff replied on September 6, 1961, that the delay was due to the defects in the microfilm. The contracting officer rejected this excuse on September 26, 1961, reminding the plaintiff of its statement on June 29, 1959, that it had finished marking the prints from the microfilm and was ready to manufacture the sets. Ten days additional were allowed plaintiff to show cause why the contract should not be terminated.

No further action was taken until November 14, 1961, when plaintiff filed a petition for reorganization under Chapter X of the Bankruptcy Act. It failed to submit a satisfactory plan, and was adjudged a bankrupt on June 27, 1962.

In the meantime, the contracting officer terminated the contracts for default on February 7, 1962. At the time of termination, nothing had been delivered by plaintiff except the preproduction model. When the contracts were terminated, the government made demand for repayment of $370,713.30 in progress payments it had made to plaintiff, and at the same time, denied plaintiff's claim for extra costs which it claimed it incurred because of the defective microfilm. The plaintiff timely appealed its claim to the Armed Services Board of Contract Appeals (ASBCA),[1] hereafter called the Board.

The parties' agreement before the Board, which is applicable here, provided that only two questions would be tried and decided, namely:

1. Justification for termination of the contracts for default, i. e., the excusability of the delays in performance; and

2. Whether the property furnished by the government under the contracts was suitable for the purposes for which it was furnished.

It was agreed that if entitlement was sustained as to either party, the case would be remanded for consideration of the amount or amounts to be paid to either party.

■ The decision of the Board was adverse to the plaintiff and the case is before us for review under the Wunderlich Act. If there is substantial evidence to support the decision of the Board on the facts, we must affirm it.

The Board found that the plaintiff's failure to deliver the production units was not due to any fault that might have existed in the microfilm. It pointed out that whatever defects there were in the microfilm had been overcome by the time of the submission of the preproduction model on September 26, 1960. It also said that plaintiff stated in its letter of December 21, 1960:

All parts and sub-assemblies of the AN/FRT-17 ( ) Radio Transmitting Set fabricated by this contractor are electrically and physically interchangeable with the corresponding parts and sub-assemblies of the model furnished by the Government under subject contract, * * *.

The Board held that this was the purpose for which plaintiff claims the microfilm and model were furnished. The plaintiff had asked for an extension of the delivery date schedule on October 4, 1961, which was granted by the contracting officer, and it was to run from January 23, 1961, the date of the approval of a list of non-standard parts submitted by plaintiff. According to

---

1. ASBCA No. 8100, appeal of M. Rudolph Preuss, Receiver in Bankruptcy of Crosby-Teletronics Corporation under Contracts Nos. NObrs–75567 and NObrs–75568.

this extended schedule, the final delivery date was September 20, 1961. The plaintiff was sent warning letters of delay in performance on August 23, 1961, and September 26, 1961, by the government. The contract was terminated for default on February 7, 1962. During all of this time, the plaintiff never delivered a single production unit. The preproduction model was the sum total of its efforts as far as the government was concerned.

Prior to termination, the government had advanced $370,713.30 in progress payments. The total amount of the contracts was $589,000. The record shows that plaintiff had incurred costs of $663,399.93 by August 11, 1961, which included the money advanced by the government and also $219,000 advanced to the company by private financiers. These figures show that by the above date, the government and the private financiers had advanced plaintiff $589,713.30 or slightly more than the total amount of both contracts ($589,000). It is obvious from these figures that at that time, the plaintiff had only spent $73,686.63 of its own funds. Yet, it was estimated that it would require an additional $293.237.68 to complete the contracts, making the total $956,637.61 or $491,179.43 more than the total sum of the two contracts. When the government denied plaintiff's claim for its alleged extra costs on September 26, 1961, the private financiers, who had discussed buying bonds of plaintiff in an amount up to one million dollars, decided they would not further invest in plaintiff company which had an estimated loss of $400,000 on this one project.

As shown above, during the period of about three years, or approximately thirty-six months, prior to August 10, 1961, plaintiff worked on the contract, it had spent only $73,686.63 of its own funds on the project. This amounted to about $2,000 per month, which is a very small expenditure on contracts amounting to $589,000. Yet, in spite of the small outlay of its own funds, plaintiff was forced to stop work on the contracts

on August 4, 1961, because it had no money or funds with which it could continue. Furthermore, its business was closed on October 31, 1961, because of a tax levy in the sum of $14,762.12 by the Internal Revenue Service. There was no money on hand for operations on that date. All of these facts indicate that plaintiff was either inadequately financed when it signed the contracts, or it used its funds for purposes other than the performance of the contracts during the contract period. The Board found that it had invested $300,000 in a subsidiary company which was lost when the company was liquidated without any distribution. It is not shown when this investment was made and it is not known whether it occurred during the period of the contract.

The plaintiff filed a petition for reorganization in bankruptcy on November 14, 1961, and was adjudicated a bankrupt on June 27, 1962. The report of the trustee in bankruptcy attached to the notice of hearing showed the financial condition of the company. Unaudited statements attached to the report showed assets on April 30, 1962, in the sum of $327,978.47 and liabilities as of November 14, 1961, in the sum of $1,699,295.98, which included the government's claim of $370,713.30 for refund of progress payments.

■ We conclude that there was substantial evidence to support the Board's findings that plaintiff's failure to proceed with production was the direct result of its inadequate financial situation, and that defendant's refusal to grant an equitable adjustment for defective microfilm did not cause such financial difficulties.

We now consider the second issue as to whether the microfilm furnished by defendant was suitable for the purposes for which it was furnished. The evidence before the Board on this question was far from satisfactory from the plaintiff's standpoint. The plaintiff had complained in its first letter regarding illegible microfilm dated December 18, 1958, that 250 frames out of 2,400 were

illegible. The record shows, and the parties seem to agree, that out of the total of 2,400 frames, 1,500 were useable, 800 were illegible until reworked (the amount of reworking was not proven) and 100 were redrawn by plaintiff. There was some evidence plaintiff had to "mark up" 1,200 frames. At the hearing, prints made by the government of the frames complained of by plaintiff in its letter of December 18, 1958, were introduced into evidence and both parties agreed they were legible and useable. At an adjourned hearing of the Board, plaintiff's former officials testified that when enlarged drawings were made of the microfilm many of the legends and lines were obscure due to blurring of figures and lines because of erasures or other defects in the original drawings from which the microfilm was made. This testimony was rather general and was of little help to the Board in determining the extent of defects in the microfilm. At this hearing, twelve drawings made from the second set of microfilm were introduced into evidence. Two of these were good and useable, six were impaired but useable by reference to other drawings, and the remaining four were worthless. However, one of these duplicated another which was partly legible and two others were duplicates. The parties stipulated that an unspecified number of other drawings were in the same condition. This stipulation was of little value in determining the extent of the defects in the microfilm. It could mean few or many other drawings were in this condition.

The plaintiff says this evidence shows that the microfilm was not suitable for the purpose for which it was furnished. The Board found otherwise and points to the fact that plaintiff was successful in manufacturing a preproduction model from the microfilm with all of its parts and sub-assemblies being electrically and physically interchangeable with the corresponding parts of the model furnished by the government, and that the preproduction model was approved by the government. The

Board said this was the purpose for which the microfilm was furnished and the final completion of the preproduction model is proof that the purpose was accomplished. Substantial evidence supports this finding. However, it is not always true that suitability means only that it is possible that the end product can be manufactured by using the government furnished property regardless of how tedious, inconvenient, or expensive the process may be. Suitability must be determined by reference to the requirements of the contract as a whole and measured by the overall use that can be made of the property in manufacturing the end product. Topkis Bros. Co. v. United States, 297 F.2d 536, 155 Ct. Cl. 648 (1961); and Thompson Ramo Wooldridge, Inc. v. United States, 361 F.2d 222, 175 Ct.Cl. 527 (1966). The plaintiff urges that the *Wooldridge* case supports its claim of non-suitability of the microfilm in the instant case. We think that case should be distinguished from our case by the quantum of use that could be made of the microfilm furnished by the government in manufacturing the end product there as compared to similar use in the case at bar. In *Wooldridge,* the evidence showed that out of 3,000 prints, 2,194 had to be reworked, 305 had to be retraced because some of the microfilm was missing, and only 505 could be used. In other words, 75 percent of the prints could not be used. In our case, out of 2,400 frames, 1,500 could be used, 100 to 150 were redrawn, 750 to 800 had to be reworked to some extent (amount not proven), and no microfilm was missing. At the hearing, 12 drawings were introduced into evidence and of these, eight were useable and 3 of the remaining 4 were duplicates. From these figures, we can conclude that 66⅔ percent or more of the frames could be used as compared with 25 percent in the *Wooldridge* case. The plaintiff has failed to show that our case is controlled by the facts in the *Wooldridge* case. However, we do not hold that the quantum of use in that case established a percentage stand-

ard by which suitability of government furnished property can be determined in every case. We agree with our holding in that case on percentage when we said:

> Since there was adequate evidence demonstrating that 75% of the film was unsuitable, we need not decide what lesser percentage, if any, would be substantial enough to constitute a failure of the warranty. At present, we leave that problem, \* \* \*, for solution on a case-by-case basis \* \* \*. *Id.* 361 F.2d at 237, 175 Ct. Cl. at 550, n. 24.

 We refer to and reaffirm our discussions and definitions of "suitability" of government furnished property for the purposes for which they are furnished, without repeating them, which are set forth in the *Topkis* and *Wooldridge* cases. It is a question of fact to be determined in each case by considering the reasonable use that can be made of the property in manufacturing the end product as required by the contract as a whole and the results obtainable from such use at a reasonable cost, effort, and expense.

In the case before us, the Board found that the microfilm furnished by the government was suitable for the purposes for which it was furnished. We cannot say that this finding is not supported by substantial evidence. While we recognize that there were some defects in the microfilm, the overwhelming majority of the frames were useable when received and most of the remainder were useable by reference to other frames or with a minimum amount of reworking. Only 100 to 150 frames had to be redrawn. When these facts are considered with those showing that by June 29, 1959, which was only 7 or 8 months after plaintiff received the microfilm, it had completed all work on the frames and drawings and was ready to start production and, thereafter, it did satisfactorily produce the preproduction model, together with the further fact that its engineering costs were

comparatively low, as shown by the discussion below, we reach the inescapable conclusion that the decision of the Board on the suitability of the government furnished property must be approved.

The plaintiff contends that the defective microfilm caused it to incur extra costs in the sum of $275,000. The Board found that the defects in the microfilm did not appear to be so extensive that they would hamper performance or increase the costs to the extent claimed by plaintiff. In our opinion, substantial evidence supports this finding. The defendant points to plaintiff's cost analysis dated August 21, 1961, which shows estimated costs on the contracts in question. This analysis shows plaintiff had expended as of August 11, 1961, in round figures, $23,000 for direct engineering and $38,000 for engineering overhead, making the total for engineering on that date $62,000. No doubt a large part of these costs would have been incurred if the microfilm had been perfect when received. But assuming, *arguendo,* that all of these costs were due to the defects in the microfilm, there remains $213,000 of plaintiff's claim of $275,000 unaccounted for. This remainder could not have accrued as engineering costs or otherwise after August 11, 1961, due to the defective microfilm, because plaintiff finished marking the film on June 29, 1959, and submitted the preproduction model on September 26, 1960, which was approved. Any costs that were incurred after these dates were not, and could not be, shown to have been costs incurred because of defective microfilm. These defects had already been remedied, and whatever costs were attributable to them had already been incurred.

The disputes clause of the contract clearly required the plaintiff to continue work on the contracts even though it was asserting a claim for equitable adjustment because of defective microfilm furnished by the government. In this regard, the contract provides:

> \* \* \* Pending final decision of a dispute hereunder, the Contractor

**1302**

shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer's decision.

■ The plaintiff failed to comply with this requirement and stopped work on the contract. This justified the government in terminating the contract for default. See Stoeckert v. United States, 391 F.2d 639, 644–646, 183 Ct. Cl. 152, 160–164 (1968); and H & H Mfg. Co. v. United States, 168 Ct.Cl. 873, 879–880 (1964).

■ The Board has found, and we agree, that the failure of the plaintiff to proceed with the contracts was due to its poor financial condition and eventual bankruptcy. This is not ordinarily a sufficient excuse for a contractor to default on a contract. See Kennedy v. United States, 164 Ct.Cl. 507, 515 (1964); and Consolidated Airborne Systems, Inc. v. United States, 348 F.2d 941, 172 Ct. Cl. 588 (1965). However, the plaintiff attempts to bring itself under the exception to this rule by contending that the defects in the government furnished microfilm caused its poor financial condition and eventual bankruptcy, and, therefore, its default in performance of the contracts was justified. It cites Litchfield Mfg. Corp. v. United States, 338 F.2d 94, 167 Ct.Cl. 604 (1964), in support of this proposition. In that case the government delayed delivering certain equipment required by the contractor for a long period of time. In the meantime, the contractor's crew and equipment was idle, and the bank cut off his credit. The contractor was forced into bankruptcy. The court there held that the government had breached the contract by failing to deliver the equipment on time and the contractor's default was excusable.

■ We think the cases are distinguishable. In our case, the Board found that plaintiff's non-performance was not due to defects in the microfilm but to plaintiff's poor financial condition. Furthermore, the Board found that plaintiff's poor financial condition was not caused by the defects in the microfilm, but was due to other causes for which the government was not responsible. The Board also found that even if plaintiff's claim that the microfilm caused it to incur $275,000 extra expense could be accepted, these extra costs were not the cause of plaintiff's lack of funds and failure to complete the contracts. These findings are supported by substantial evidence. Accordingly, the *Litchfield* case is not applicable.

The plaintiff did not prove that had it not been for the alleged $275,000 extra costs it would have remained solvent with enough funds on hand to complete the contract, and the Board so found. There was vague and indefinite evidence that plaintiff would have received up to $1,000,000 from private investors if the government had recognized its claim for extra costs. However, this seems to have been more of a hope than a binding promise. The record shows that these private investors were actually buying bonds of the company and were not financing any particular contract.[2] For instance, Mr. Robert S. Marston, former president of the plaintiff, testified:

A. * * * I mentioned we had been working on a bond issue with a group of private investors who had put some 200 odd thousand dollars into the company in I think June and there were discussions involving an additional sum which would bring it up to I think one million one hundred thousand by the end of September * * *. [Tr. pp. 207–208.]

This testimony does not show any binding obligation on the part of the investors. They were acting voluntarily and were not required to lend money to plaintiff. Such evidence is insufficient to impose responsibility or liability on the government for plaintiff's failure to sell bonds to these investors even if it could be said that plaintiff

---

2. Plaintiff had other contracts than those involved in this case.

was entitled to collect its claim for alleged costs.

The government has filed a counterclaim in this case in the sum of $370,-713.30 representing advance progress payments made by it to plaintiff on the subject contracts. There is no dispute between the parties that by August 1961, this amount had been paid to plaintiff, but plaintiff had not delivered any of the production units called for in the contract except the preproduction model. The contract provided:

> (h) *Special Provisions Regarding Default.* If this contract is terminated pursuant to the clause entitled "Default", (i) the Contractor shall, upon demand, pay to the Government the amount of unliquidated progress payments and (ii) with respect to all property as to which the Government elects not to require delivery under the clause entitled "Default", title shall vest in the Contractor upon full liquidation of progress payments, and the Government shall be liable for no payment except as provided by the "Default" clause.

The plaintiff says this court does not have jurisdiction of the counterclaim because the government filed such counterclaim in the court of bankruptcy before it was filed in this court. It asserts that the bankruptcy court first acquired jurisdiction of the claim and still retains it to the exclusion of this court. We do not agree.

The trustee in bankruptcy is an officer of the bankruptcy court. He had full knowledge of all the facts set forth above when he elected to file this suit for the plaintiff in this court. It is not shown whether the bankruptcy court specifically authorized this suit to be filed. However, in the plaintiff's post argument brief there is a statement that the records of the bankruptcy court contain an order dated March 30, 1962, "authorizing plaintiff [trustee] to retain present counsel and to continue to prosecute all necessary appeals and to institute necessary plenary actions." This would appear to include this suit and could be said to be a waiver of jurisdiction by the bankruptcy court over the government's claim in favor of this court. In any event, the trustee selected this court for the trial of his case, which includes any counterclaim or set-off the government may have. He could not maintain his suit in the bankruptcy court because of the $10,000 jurisdictional limitation in district courts. This is the only court where he could sue the government for more than that amount. Having selected this court for the trial of his case, the trustee is bound by all statutes and rules applicable to it.

By special statute, set-off is allowed in this court. Title 28, U.S.C. § 1503 (1964) provides:

> The Court of Claims shall have jurisdiction to render judgment upon any set-off or demand by the United States against any plaintiff in such court. * * *

To the same effect is Title 28, U.S.C. § 2508 (1964), except that it is mandatory in its provisions and provides that the Court of Claims *shall hear and determine* both the plaintiff's claim as well as the counterclaim or set-off of the United States.[3]

3. § 2508. Counterclaim or set-off; registration of judgment.
"Upon the trial of any suit in the Court of Claims in which any setoff, counterclaim, claim for damages, or other demand is set up on the part of the United States against any plaintiff making claim against the United States in said court, the court shall hear and determine such claim or demand both for and against the United States and plaintiff.

"If upon the whole case it finds that the plaintiff is indebted to the United States it shall render judgment to that effect, and such judgment shall be final and reviewable.
"The transcript of such judgment, filed in the clerk's office of any district court, shall be entered upon the records and shall be enforceable as other judgments. * * * *"

The plaintiff would have us ignore the plain provisions of these statutes and deny the government the right of set-off in this court where the set-off can be asserted on the basis of one hundred percent of its face amount, and relegate the government to the bankruptcy court as a general creditor where its set-off would in all probability be worth only a few cents on the dollar. This we cannot do. The plaintiff chose this court and must abide by the laws under which it operates.

We had this same question before us in the recent case of Marley v. United States, 381 F.2d 738, 180 Ct.Cl. 898 (1967). There, as here, the counterclaim of the government was filed in both the bankruptcy court and in this court. The plaintiff made the same jurisdictional argument there that the present plaintiff is making here. We held that the counterclaim could be litigated here. There we said:

Firth's trustee having instituted an action against the United States, there became operative a statutory provision conferring jurisdiction on the Court of Claims "to render judgment upon any set-off or demand by the United States against any plaintiff in such court." 28 U.S.C. § 1503 (1964 ed.); see also 28 U.S.C. § 2508 (1964 ed.). Judge Littleton, speaking for this court in Frantz Equip. Co. v. United States, 105 F.Supp. 490, 495, 122 Ct.Cl. 622, 630 (1952), indicated the approach we should take in cases involving the right of the United States to assert counterclaims and claims for offsets:

We are not at liberty, by interpretation, to limit or restrict the plain and broad terms of the statute relating to the right of the Government to assert counterclaims and to the jurisdiction of this court to hear and determine such claims.

Such insight into the proper application of section 1503 finds expression in the Supreme Court's earlier articulation of the purpose underlying the section: "to permit the Government, when sued in the Court of Claims, to have determined in a single suit all questions which involved mutual obligations between the Government and a claimant against it." Cherry Cotton Mills, Inc. v. United States, 327 U.S. 536, 539, 66 S.Ct. 729, 90 L.Ed. 835 (1946). *Id.* 381 F.2d at 741–742, 180 Ct.Cl. at 905–906.

We also held in that case (381 F.2d 738, 180 Ct.Cl. at page 907) that by filing his suit here, the trustee recognized that this court, rather than the bankruptcy court, had jurisdiction to determine the rights of the parties. We think that case is decisive of the question under discussion.

The plaintiff says that it is not before this court for all purposes, and that it recognizes this court has jurisdiction to try its case against the government but does not recognize that it has jurisdiction to try the government's counterclaim against it. The plaintiff trustee's recognition of these matters is not controlling. Litigants in this court are not subjected to such one-sided judicial procedure. When suit is filed here and the issues are joined, the parties are here for all purposes encompassed within the jurisdiction conferred on this court by Congress. This includes claims of a plaintiff against the United States and counterclaims and set-offs of the government against the plaintiff.

We hold that this court has jurisdiction of the counterclaim of the government against the plaintiff.

The plaintiff contends that the government's counterclaim is not ripe for adjudication because of its mitigation defense. In this connection, it contends that when the government terminated the contracts for default, it was obligated to take over the inventory and work in progress of the plaintiff and thereby mitigate defendant's losses,

and that these matters should be determined by the district court. We do not agree. There was no obligation on the part of the government to take over the inventory or work in progress upon the termination of the contract. The default article (Article 11(d)) of the contract says that the government "may" require the contractor to deliver material on hand to the government, but this is permissive and not required. Also, paragraph (h) of Article 41 relating to progress payments quoted above, states that the government shall not be required to pay for any property it does not require to be delivered under the default clause. We see no merit to this contention of the plaintiff. There appears to be no dispute as to the facts surrounding the counterclaim and we conclude that it is ripe for adjudication as far as entitlement is concerned.

We do not find it necessary to reach the issues of mutual mistake and breach of contract raised by the plaintiff, nor the issue advanced by the defendant that plaintiff having accepted a new delivery schedule in January and February 1961, could not complain of any cause of delay occurring prior to that time.

We hold that plaintiff's second, fourth, fifth and seventh causes of action, and defendant's first counterclaim are hereby dismissed with prejudice; that judgment is hereby entered for plaintiff against the defendant on its sixth cause of action for the sum of $721.92; that judgment is hereby entered for defendant against plaintiff on its second counterclaim in the sum of $765.73; all of which has been agreed to by stipulations of the parties filed herein.

We also hold that there is substantial evidence to support the findings of fact made by the Board pertaining to the two issues tried by it and its decision is correct as a matter of law that:

1. The plaintiff was not excused for its delays in performance and the government was justified in terminating the contract for default; and

2. The property (microfilm) furnished by the government under the contracts was suitable for the purposes for which it was furnished; and the decision of the Board is affirmed; that the plaintiff is not entitled to recover on its third cause of action and it is dismissed; and that defendant is entitled to recover on its counterclaim and this part of the case is hereby suspended for a period of not exceeding 90 days and is remanded to the Board for its determination of the amount of defendant's recovery, unless the parties dispose of it by agreement. Defendant shall comply with Rule 100 and the General Order of April 1, 1968, implementing it.