**WHITTAKER CORPORATION**
v.
**The UNITED STATES.**
No. 173–66.

United States Court of Claims.

Decided June 11, 1971.

Walter F. Pettit, San Francisco, Cal., attorney of record, for plaintiff, Roger N. Boyd, John Lane, Jr., and Reavis, Pogue, Neal & Rose, Washington, D. C., of counsel.

Frances L. Nunn, Washington, D. C., with whom was Asst. Atty. Gen. L. Patrick Gray, III, for defendant, James N. McCune, Washington, D. C., of counsel.

Before COWEN, Chief Judge, LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

PER CURIAM:

This case was referred to Trial Commissioner Harry E. Wood with directions to prepare and file his opinion on the issues of plaintiff's motion and defendant's cross-motion for summary judgment under the order of reference and Rule 166(c). The commissioner has done so in an opinion and report filed on May 12, 1970, wherein such facts as are necessary to the opinion are set forth. Requests for review by the court were filed by both parties and the case has been submitted to the court on oral argument of counsel and the briefs of the parties.

The plaintiff urges that the court go further than the trial commissioner and dispose of the whole of this old case, or at least of certain specified issues, at this time. We have examined each of

such questions raised by the contractor and are satisfied that, on the record as it now stands, we cannot resolve any of them, favorably to the plaintiff, under the standards laid down or implicit in United States v. Anthony Grace & Sons, Inc., 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966) and United States v. Utah Construction & Mining Co., 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966). We therefore agree with Commissioner Wood that those issues should not be decided now. As for the Government's exceptions to the commissioner's careful analysis of the Board's opinion in the light of the record, we find those exceptions wholly without merit and adequately answered by the opinion.

Since the court agrees with the opinion and recommended conclusion of the trial commissioner, as hereinafter set forth, it hereby adopts the same, together with the foregoing paragraph, as the basis for its judgment in this case. Therefore, plaintiff's motion for summary judgment is granted as to Count I and defendant's cross-motion thereto is denied; decision on Counts II and III of the petition is deferred; defendant's counterclaim is dismissed; and, further proceedings herein are stayed, pursuant to (and subject to the terms of) Rule 167, for a period of six months to afford plaintiff an opportunity to obtain further administrative consideration on the issue whether, on January 13, 1961, plaintiff was in default.

## OPINION OF COMMISSIONER

WOOD, Commissioner:

By contract executed June 27, 1960, plaintiff (then styled Telecomputing Corporation), a California corporation, undertook to manufacture and deliver to defendant (acting through the Department of the Navy) 301 airborne terrain clearance radar systems, plus 43 separate power supply units, for a fixed price of $1,744,146. On January 13, 1961, defendant terminated the contract for default. Defendant then entered into a replacement contract with Stewart-Warner Corporation, and assessed against plaintiff, as the excess cost of reprocurement, the sum of $1,347,833.

On appeal, the Armed Services Board of Contract Appeals upheld both the default termination and the assessment of excess cost. Appeal of Telecomputing Corporation, ASBCA No. 7154, 1962 BCA ¶ 3620.[1] The case is now before the court on cross-motions for summary judgment for review, under Wunderlich Act[2] standards, of that decision.

Plaintiff's petition is in three counts. Count I alleges, *inter alia*, that plaintiff's performance was delayed a total of some 109 days by reason of defendant's failure timely to deliver an adequate Goverment-Furnished Property (GFP) drawing package. Accordingly, Count I asserts, at termination on January 13, 1961, only 44 days after a preproduction model was required to be (but concededly was not) ready for testing, plaintiff was not in default; termination for default was therefore improper; and the Board's contrary findings and conclusions do not deserve finality.[3]

Count II, incorporating the allegations of Count I, asserts substantial payment on the assessment of excess cost; that the termination of plaintiff's contract and the assessment were improper and without legal basis; and that plaintiff is entitled to be repaid all amounts paid to defendant in consequence of the as-

---

1. By order dated January 16, 1963, this decision was amended to correct "mathematical error in the amount of excess costs appearing" therein. Motions by both parties for reconsideration were denied November 15, 1965. 65–2 BCA ¶ 5223.

2. 68 Stat. 81, 41 U.S.C. §§ 321, 322 (1964).

3. In Count I, plaintiff claims "its additional costs incurred because of the delayed receipt of suitable GFP drawings", and that the default termination should be converted to a termination for convenience of the government.

sessment.[4] Count III alleges that in any event the assessment was excessive because of defendant's failure to mitigate damages.

For reasons appearing hereinafter, it is concluded that plaintiff's motion for summary judgment should be granted as to Count I;[5] that defendant's cross-motion for summary judgment should be denied as to that Count; that decision on Counts II and III should be deferred; and that plaintiff should be afforded an opportunity to obtain further administrative consideration on the issue whether, on January 13, 1961, plaintiff was in default.[6] Compare J. D. Hedin Constr. Co. v. United States, 187 Ct.Cl. 45, 408 F.2d 424 (1969); Bailey Specialized Bldgs., Inc. v. United States, 186 Ct.Cl. 71, 404 F.2d 355 (1968).

## INTRODUCTION

The radar equipment in suit, commonly called the APG–53A, is a terrain scanning electronic complex largely designed and developed in 1957–1958 at the Naval Avionics Facility, Indianapolis, Indiana (NAFI) for use in low-level land strikes by Navy Douglas A4D carrier-based aircraft. One major component, the azimuth elevation range indicator, was designed and first produced about 1958 by IT&T Federal (formerly known as Farnsworth). Upon demonstration of the feasibility of the APG–53A, it was adopted by the Navy as standard A4D equipment, and NAFI built 80 systems for installation in such aircraft.

A complete APG–53A system includes a receiver-transmitter group; a power supply; a terrain clearance altitude computer; an azimuth elevation range indicator; a wiring harness; and a control box. In November 1958, a contract for the first commercial procurement of the APG–53A was let to Stewart-Warner Corporation. This contract called for 230 systems, with deliveries ending in April 1961.

On February 19, 1960, the Bureau of Naval Weapons distributed a Request for Proposals covering the four major components of the APG–53A (receiver-transmitter, power supply, computer, and indicator). Among other things, the Request stated that a model of the "APG–53A Radar Set, with Manufacturing Drawings" would be available at NAFI for inspection by prospective bidders "from 1 March 1960 through 20 March 1960 * * *."[7]

According to the Board, the Request for Proposals contemplated a "contract time-table" as follows:

* * * opening of proposals on 30 March 1960; negotiation with contractor submitting low proposal, approvals of facilities, personnel, etc., and security clearance during the next 90 days; award of contract before the expiration of the 90 days, or by 30 June 1960; receipt by contractor of Government furnished property, purchasing or manufacture of component parts, and assembly of a preproduction model of a complete APG–53A ready

---

4. Defendant counterclaimed herein that plaintiff owed sums to defendant in consequence of the assessment. Defendant has since stated that the assessment has been paid in full and that its counterclaim may be dismissed.

5. While Count I alleges, *inter alia*, that defendant "failed to perfect its right under the Default clause to terminate on the ground of failure to make progress", Count I rests on a claim of "delayed receipt of suitable GFP drawings"; Count II incorporates the allegations of Count I and pleads improper and unlawful termination and assessment of excess cost. This opinion does not reach the issue of

"defective termination". *Cf.* American Marine Upholstery Co. v. United States, 170 Ct.Cl. 564, 345 F.2d 577 (1965).

6. To the extent that further administrative consideration of issues not foreclosed by this opinion should be or become necessary or desirable, such consideration is, of course, not hereby precluded.

7. The Board alludes to "drawings and specifications for the APG–53A on display as a design data package on 19 February 1960 * * *." One witness testified to the February 19, 1960 display date, and that the package came off display March 9, 1960. The variance is not significant.

for testing in contractor's plant by November 1960; further testing of the model by NAFI at its own facilities for the next 120 days; delivery of the APG–53A in March 1961 at an initial rate of 7 per month, accelerating to 10 in April, 17 per month May–November, and 20 per month thereafter to completion.

The Board found that plaintiff "viewed the design data package on display" (hereinafter the "display package") and, on March 3, 1960, purchased "its own data package * * *" (hereinafter the "bid package") from the Marbaugh Engineering Supply Company, which "reproduced for sale the data and drawings obtained from NAFI." The bid package ("1 Complete set Prints Mfg., Tooling, Test Bench, etc. APG 53 [sic] Radar Set * * *") was the subject of many Board findings challenged by plaintiff and treated hereinafter.

On March 28, 1960, plaintiff submitted its proposal on 356 systems and extras for which proposals were requested. Plaintiff was low bidder and, after demonstrating financial responsibility and a record of technical proficiency, was approved as a contractor, subject to security clearance, personnel checks, further negotiations, and the like. Security clearance was obtained June 1, 1960, and a contract for 301 systems (rather than the 356 systems "advertised"), plus extras, was negotiated at a unit price of $5,306 and a total price of $1,744,146.

Plaintiff's contract, executed June 27, 1960, required it to have a preproduction model ready for testing not later than November 1960, and called for deliveries beginning in March 1961, timed to coincide with the phasing out of production under Stewart-Warner's 1958 contract.[8] Plaintiff failed to assemble the preproduction model ready for testing, in November 1960 or thereafter, and on Jan-

uary 13, 1961, defendant terminated the contract for default, on the stated ground of "failure to make delivery of preproduction models [sic] within the time specified in the contract." The reprocurement and excess cost assessment alluded to above followed.

### THE CONTRACT

The "Government-Furnished Property" (GFP) clause provided in pertinent part that defendant "shall deliver" to plaintiff, "for use in connection with and under the terms of this contract, the property described in the Schedule * *, together with such related data and information as the Contractor may request and as may reasonably be required for the intended use of such property * * " and that plaintiff's "delivery or performance dates" were "based upon the expectation that Government-Furnished Property suitable for use will be delivered to the Contractor * * * in sufficient time to enable the Contractor to meet such delivery or performance dates". The GFP clause further provided that if GFP "is not delivered to the Contractor by such time or times," or in the event of delivery of such property "in a condition not suitable for the intended use", the contracting officer, upon timely request, "shall" equitably adjust delivery or performance dates, contract price, or both. Such provisions for adjustment were "exclusive", with defendant not to be liable to suit for breach of contract for delay in delivery of GFP, or its delivery in a condition "not suitable for its intended use." See Preuss v. United States, 188 Ct.Cl. 469, 412 F.2d 1293 (1969).

Section C of the contract Schedule (hereinafter Section C) listed, as government-furnished property, a receiver-transmitter group; a power supply; a computer; an indicator; a radar set con-

---

8. The units were to be installed in Douglas A4D's on the assembly line, and deliveries under Stewart-Warner's 1958 contract were to end in April 1961. As the Board put it, "The essentiality of the synchronization of deliveries with Stewart-Warner and Douglas operations for economic and strategic reasons was emphasized" to plaintiff during bidding and prior to contract award.

trol; and "One (1) Set AN/APG–53A Drawings". Immediately thereafter appeared this provision:

The Government will make available to the Contractor for the Contractor's use hereunder equipment as listed above and, if available, drawings used in the manufacture of such model, provided that making such drawings available shall not constitute a representation by the Government * * * that such drawings, which are solely

for informational and guidance purposes, are accurate or complete.

 *  *  *  *  *  *

The contract also stated that the components to be manufactured by plaintiff "shall [with exceptions not here material] be in accordance with Specification MIL–R–21388 (Aer), dated 1 October 1958, and Amendment No. 1 thereto, dated 15 July 1959, * * *." [9] Section 2.1 of Specification MIL–R–21388, "Applicable Documents", *General*, provided in part that:

The following documents of the issue in effect on the date of invitation for bids, form a part of this specification.

 *  *  *  *  *  *  *  *

DRAWINGS
 *Bureau of Aeronautics*
 List of Drawings   Radar Set AN/APG–53A
 LD 286962 (see section 6)

—◆—

Section 6.2 "Notes", *Availability of Drawings*, read as follows:

Complete sets of manufacturing drawings are available for Radar Set AN/APG–53A. LD 286962 is an index of all drawing lists required for all of the system components. If a complete set of manufacturing drawings is required, order LD 286962 and copies of all drawings referenced therein. If drawings which pertain to only a specific component are required, consult LD 286962 for the applicable List of Drawings Number, and order only the drawings referenced in the applicable list. Requests for drawings must contain a statement of justification for actual need in relation to a government contract.

### THE DRAWINGS DELAY

On July 1, 1960, four days after contract execution, plaintiff, by letter to the Bureau of Naval Weapons, requested shipment to its subsidiary, Value Engineered Products, Monterey Park, California, of "Government-Furnished Property and available drawings to be supplied under the contract". On July 6 and 8, 1960, NAFI shipped, via airfreight, four "black box" models and an incomplete set of APG–53A drawings.[10] Omitted were drawings for the indicator; these drawings were then being converted from commercial to military form with, the Board said, information on the military drawings "identical to the IT&T drawings shown in the display package and included in the [bid] package purchased by [plaintiff] on 3 March" 1960.[11]

9. Specification MIL–R–21388 provided that, in case of conflict between Specification and "the contract", the contract should have precedence.

10. While the Board did not so find, plaintiff received these drawings July 12 and 13, 1960, Ray D. Bolander Co. v. United States, 186 Ct.Cl. 398, 409 n. 11 (1968).

The terms of the GFP clause make the date the GFP was "delivered to the Contractor", not the date it was shipped by defendant, the relevant "time or times" here.

11. As will appear *infra*, the quoted findings are not supported by substantial evidence.

The "military set of indicator drawings" was shipped to plaintiff July 22, 1960; a "second reproducible set of the same drawings" was shipped on July 28, 1960. The date of delivery of these shipments to plaintiff is not clear from the record, but plaintiff claimed, and here alleges, that it received the reproducible drawings on or about August 3, 1960.[12]

Plaintiff's position before the Board was, and here is, (1) that defendant did not furnish plaintiff essential drawings until August 3, 1960, and that this delay in furnishing required drawings delayed plaintiff's performance by 34 days; and (2) that the drawings defendant furnished were, when received, not "suitable for the intended use", thereby delaying plaintiff an additional 75 days (including seven days claimed for mandatory engineering change orders). The Board found an excusable delay of seven days due to such change orders, but otherwise denied plaintiff's claims.

### Late Delivery of Drawings

In rejecting plaintiff's contention that it was delayed 34 days by defendant's late delivery of GFP drawings, the Board found that the display package shown to prospective bidders and the bid package plaintiff purchased from Marbaugh Engineering Supply Company on March 3, 1960, each "contained about 2,500 drawings, * * * 1712 related specifically to the four black boxes * * *"; that in each package there was a separate and complete set of drawings for each "black box"; and, that, excluding duplicate drawings of parts and pieces common to more than one component, 1,274 different drawings were "necessary for the four black boxes."

The Board also found that the display package was "the same as" the bid package; that the bid package contained all drawings necessary to build the four "black boxes" in compliance with plaintiff's contract; that plaintiff, from and after March 3, 1960, had in its possession "drawings authorized and suitable for use in assembling the preproduction model * * *"; that plaintiff "could have avoided the claimed delay of 34 days by use of the suitable drawings in its possession"; and that any delay in delivery of GFP drawings to plaintiff by defendant was therefore within plaintiff's control and hence inexcusable.

Plaintiff asserts that the Board's findings and conclusions respecting the bid package drawings are arbitrary, unsupported by any substantial evidence, to the extent based on conclusions of law erroneous, and therefore not entitled to finality. Defendant contends that plaintiff did not pursue the "administrative procedure" for obtaining an extension of time for late delivery of GFP drawings, and is therefore barred by its failure to exhaust administrative remedies, but that, failure to exhaust aside, the Board's findings are supported by substantial evidence.

Defendant's failure to exhaust argument has no merit. Both the contracting officer and the Board considered plaintiff's right to a time extension due to claimed late delivery of GFP drawings (and to a time extension due to claimed unsuitability of drawings as well) "on its merits without any point being made" of lack of a proper request for extension of time. Dittmore-Freimuth Corp. v. United States, 182 Ct.Cl. 507, 511, 390 F.2d 664, 668 (1968); see also Blount Bros. Corp. v. United States, 191 Ct.Cl. 784, 787–788, 424 F.2d 1074, 1076, (1970); Fox Valley Engineering, Inc. v. United States, 151 Ct.Cl. 228, 237–238 (1960). Any failure to follow contractual avenues of relief has been waived. *Ibid.*

Defendant's effort to counter plaintiff's attack on the Board's "bid package" findings and conclusions also fails. While defendant quotes extensively from, and relies strongly upon, the testimony of Mr. Carboa, the NAFI draftsman who

---

12. While the Board did not so state, it is clear from the record that the GFP drawings were to be reproducible sepias, not blueprints. Ray D. Bolander Co. v. United States, n. 10, *supra.*

made up the display package, and Mr. Hague, also of NAFI, the inventor and developer of the APG–53A, careful study of the administrative record makes it clear that the "facts affirmatively found by the Board are based on insubstantial evidence." Dean Constr. Co. v. United States, 188 Ct.Cl. 62, 67, 411 F.2d 1238, 1241 (1969).

Mr. Carboa was admittedly "not competent to testify to the technical engineering matters." The bulk of his testimony was directed to the display package, not the bid package itself. He did not testify about the contents of the bid package, which he never saw. He did not furnish the display package to Marbaugh for reproduction, and did not know when it was furnished. He had no dealings with Marbaugh. He knew "very little" about how Marbaugh reproduced drawings, and was familiar with Marbaugh in only one respect: that "In this instance they reproduced the display package as a subcontractor of the Government." [13]

Mr. Carboa did testify, over plaintiff's objection, that two unsuccessful bidders also purchased drawings from Marbaugh; that no complaint from these unsuccessful bidders had reached him; and that "any question in the normal course of events" would get back to him. The propriety of permitting such testimony aside, it has no probative value. Sternberger v. United States, 185 Ct.Cl. 528, 401 F.2d 1012 (1968).

Mr. Hague never saw the bid package, the display package, or the GFP package. He was no more than "familiar" with the drawings supposedly in the display and GFP packages. He did not, and could not, testify that the "bid package contained all the drawings necessary to build the four black boxes in compliance with the contract." His statement that both NAFI and Stewart-Warner had "built successful equipments to the drawings supplied to" plaintiff deserves no weight.[14] He did not know what plaintiff was supplied. His testimony fails to buttress the Board's findings as to either the bid or display packages. *Ibid.*

Careful scrutiny of the entire administrative record reveals no support for the Board's findings as to the contents of the bid package, nor for its decision that the bid package was authorized and suitable for use in contract performance. The conclusion that plaintiff could have avoided delay by use of the bid package is arbitrary, unsupported by substantial evidence, and legally erroneous.

While certain other findings and conclusions relating to the claim of late delivery of drawings do not appear to be central to the Board's disposition of that issue, plaintiff contends, and defendant denies, that they are fatally defective. In view of the necessity for further administrative consideration of this case, comment on certain of these controverted findings and conclusions is now appropriate.

*First:* The Board properly recognized that defendant was obligated to furnish to plaintiff a complete set of APG–53A drawings, and that plaintiff was entitled to use those GFP drawings in the performance of its contract. The Board nonetheless held that there were *two* sets of contract drawings (the bid package and the GFP package), "identical in content except for revisions made in updating the GFP package, and either one sufficient for contract performance."

Since, for reasons set forth above, the Board's findings and conclusions respecting the bid package do not deserve fi-

---

13. Defendant asserts that the drawings were sent to Marbaugh as a Government contractor, that Marbaugh acted as its agent and authorized distributor, and that the bid package was official, accurate, and as authentic as if "reproduced in the defendant's own shop or sold by the defendant." There is no evidentiary basis whatever for the assertions.

14. Mr. Hague subsequently admitted, on cross-examination, that NAFI and Stewart-Warner "produced pre-production models to the drawings that were in effect at the time we built the models", and that "they would not be the same drawings [furnished to plaintiff]". He also testified that "We are constantly changing those drawings."

nality under Wunderlich Act standards, these findings and conclusions also fall. There are, however, other difficulties with them.

All of the 183 indicator drawings, in the display package in commercial form, were redrawn after February 19, 1960; during the process, which continued into July 1960, known errors in those drawings were corrected. The Board failed to give any weight to Mr. Hague's admissions in this respect, for it found that the commercial and military indicator drawings contained "identical" information.[15] Assuming the bid and display packages to be "the same", the Board's finding is arbitrary.

Moreover, underlying the conclusion that there were two differing sets of "contract drawings",[16] either sufficient for contract performance, is the clear, if unarticulated, premise that *any* set of APG–53A drawings, of whatever vintages, would suffice. Indeed, in tacit concession that the Board held just that, defendant bluntly contends that which revision of a particular drawing was supplied "made no difference * * *." As will be seen *infra*, in connection with the issue of claimed unsuitability of GFP drawings, that holding is an untenable one.

*Second:* The Board also held, and defendant here contends, that the contract made a request by plaintiff for GFP drawings a condition precedent to defendant's obligation to deliver them to plaintiff. The holding was two-pronged: that it was "incumbent" on plaintiff to advise NAFI to which security cleared facility the drawings were to be shipped, and to notify NAFI, by list number, which drawings it required.

Defendant's sole authority for the proposition that defendant's receipt of shipping advice was a precondition to its obligation to deliver GFP drawings is the Board opinion. That proposition has no support in the record, and does not survive analysis. The Board found that plaintiff received security clearance June 1, 1960. Indeed, the record strongly suggests that *facility* approval, and *facility* security clearance, were required and given. In any event, however, plaintiff was the "Contractor" specified in the GFP clause, and no reason against delivery to that "Contractor" is suggested or appears.

The second conclusion has no more substance. To quote from the GFP clause, defendant "shall deliver" to plaintiff, in "sufficient time" to enable plaintiff to meet delivery or performance dates in its contract, a set of APG–53A drawings suitable for use. This mandatory, and unqualified,[17] language, omit-

---

15. Mr. Hague testified that there were "some errors in the [IT&T indicator] drawings," and that those "errors that we were aware of" were corrected in the redrawing process. He was then asked, "Is there any difference in the information contained in the IT&T indicator drawings * * * included in the bid or display package and the indicator drawings as they were redrawn?" His answer was, "Not to my knowledge, no, sir." Board counsel for defendant then stated: "The only difference, so far as you know, is in the format; and I believe you testified that BuWeaps numbers were put on these drawings." The absence of any question notwithstanding, Mr. Hague reiterated "*And known errors were corrected.*" (Emphasis supplied).

16. Mr. Carboa testified that the display package, completed February 4, 1960,

went on display February 19, 1960; that in April 1960, shortly after being withdrawn from display, the display package (which became a "production data package") was updated; that continuing maintenance of the production data package in a current status was a requirement; and that the data package was revised by checking engineering change orders. Between March 9 and July 6, 1960, there were (indicator drawings aside) some 125 "engineering [change] orders and planned revisions * * *." Moreover, the great majority of changes on APG–53A commercial part drawings were not documented by engineering change orders.

17. Cf. Preuss v. United States, 188 Ct.Cl. 469, 475, 412 F.2d 1293, 1296 (1968); Thompson Ramo Wooldridge Inc. v. United States, 175 Ct.Cl. 527, 534 n. 7, 361 F.2d 222, 227 note (1966), where the

ted by defendant in its quotation of the GFP clause, refutes the contention that defendant's duty to deliver GFP drawings arose only after a request from plaintiff for the drawings.

But, defendant argues in substance, though not in precisely these terms, Section 6.2, *"Availability of Drawings,"* of Specification MIL–R–21388, quoted *supra,* limits defendant's obligation under the GFP clause to "deliver[ing] the drawings upon application." [18]  As defendant construes Section 6.2, it would conflict with the GFP clause and the latter would therefore take precedence. There is, however, no real inconsistency between the GFP clause and Section 6.2. The latter relates to procedures for requesting drawings not elsewhere unqualifiedly promised, "If * * * required". Properly read, Section 6.2 is not inconsistent with the GFP clause (itself referring to such *other* "related data and information as the Contractor may request and as may reasonably be required * * * ") and does not narrow the obligations there imposed on, and undertaken by, defendant.

*Third:* At the Board, defendant asserted, and plaintiff denied, that exculpatory language in Section C [19] "takes precedence over the 'suitability for use' provision" of the GFP clause, and that, accordingly, defendant was not obligated to provide GFP drawings, did not warrant their suitability, and did provide them "solely for informational and guidance purposes." In this court, defendant does not go quite so far, but does assert a Schedule C "disclaimer". Plaintiff denies the disclaimer any efficacy, and rightly so.

Both defendant's contention administratively, and its present more limited position, are legally erroneous. The conditional and exculpatory portions of Schedule C must be construed as limited to drawings "used in the manufacture of such model," promised only "if available" and then not warranted, and not as extending to APG–53A drawings suitable for use, to which, under the GFP clause and Schedule C, plaintiff was entitled as a matter of right. See Thompson Ramo Wooldridge Inc. v. United States, 175 Ct.Cl. 527, 535–537, 361 F.2d 222, 228–229 (1966).[20]

■ In light of the foregoing, the Board's decision on plaintiff's claim of delay due to late delivery of drawings is arbitrary, unsupported by substantial evidence, legally erroneous, and not entitled to any finality.

Plaintiff's syllogism is that defendant was required to furnish plaintiff a suitable set of GFP drawings no later than July 1, 1960; that plaintiff did not receive a *complete* set of drawings until August 3, 1960; and, therefore, that defendant's delay in furnishing drawings

---

contract called upon defendant to furnish property upon written request. See also Goodwin, Government-Furnished Property, ¶ 11 (Government Contracts Monograph No. 6, 1962).

18. In quoting Section 6.2, the Board omitted (without any indication of omission) its last sentence: "Requests for drawings must contain a statement of justification for actual need in relation to a government contract." Defendant's brief in support of its motion for summary judgment (not filed by its present counsel) thrice quotes Section 6.2 as did the Board.

19. Section C provided that GFP should include "One (1) Set AN/APG–53A Drawings." Immediately below the GFP enumeration, this sentence appeared: "The

Government will make available to the Contractor for the Contractor's use hereunder *equipment* as listed above, and, *if available, drawings used in the manufacture of such model,* provided that making such drawings available shall not constitute a representation by the Government, either express or implied, that such drawings, which are solely for informational and guidance purposes, are accurate or complete." (Emphasis supplied.)

20. While defendant says that the language of the Schedule is "similar" to that before the court in the cited case, the present provision does *not* "define (and therefore limit the reach of) the" GFP clause. Id., 175 Ct.Cl. at 539, 361 F.2d at 230.

in and of itself delayed plaintiff's performance a total of 34 days.

The Board made no findings of fact in these areas. The factual questions involved are for initial determination administratively. United States v. Anthony Grace & Sons, Inc., 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966).[21] It is, however, worthy of present note that, assuming the accuracy of plaintiff's premises, its conclusion by no means follows inevitably. Drawings for the receiver-transmitter, power supply, and computer were delivered to plaintiff July 12 and 13, 1960, within two weeks from the time plaintiff says it should have had the GFP drawings. As defendant suggests, the excusable delay due to late receipt of a complete set of GFP drawings may prove to be less than that claimed.

### The Claimed Unsuitability of Drawings

The Board also rejected plaintiff's argument that, when received, the GFP drawings were not suitable for use, and that it was thereby delayed some 75 days.[22]

Plaintiff contended administratively that under the GFP clause it was entitled to drawings "suitable for use for their intended use, * * * that is, an immediate release [for purchasing]." As noted above, defendant urged before the Board (and plaintiff denied) that Schedule C "takes precedence" over the suitability for use provisions of the GFP clause. The Board "found" that:

> * * * the opposing arguments do not meet the real issue. The question to be decided is not whether the Government should be exculpated from

liability for alleged failure to comply with Standard Provision 33(a) [the GFP clause], but, more precisely, whether the contractor was delayed for causes beyond its control and without its fault or negligence by virtue of the form and manner in which the GFP drawings were furnished.

The Board findings and conclusions on this aspect of the case are summarized below.

The Board recognized that, with a five-month period from contract award to preproduction model testing, "there was no time to lose", but concluded that plaintiff's claimed intent to "dump" (release drawings for purchasing immediately upon receipt) was not supported by the evidence. Rather, the Board found, a 30-day period for checking and correcting "inevitable errors, missing or illegible drawings, and in arranging and organizing of drawings," prior to release for purchasing, was a "normal interval."

According to the Board, Mr. Cleary, plaintiff's technical manager,[23] was "dismayed and confused by the GFP drawings because some were not of the latest revision and the package was not organized or correlated in an 'ideal' manner suitable for immediate release or 'dumping.'" Mr. Cleary, then asked for, but NAFI refused to make, "the 'ideal' correlation of drawings, or a take-off from its index of drawing revisions." In view of this refusal, plaintiff, at the beginning of August 1960, began to compile an inventory of drawings. The inventory, compiled by a technician and clerk, and submitted to NAFI August 25, 1960, "contained hundreds of errors and was worthless" and plaintiff thus wasted

---

21. Plaintiff was, for reasons not here at issue, excusably delayed seven days. Contract termination occurred 44 days after November 1960. Granting plaintiff's conclusion of 34 days' delay due to late delivery of drawings, it would still fall just short of being, at termination, not in default. As will be seen, the Board decision on suitability of GFP drawings is not entitled to finality, and further administrative consideration of default *vel non* is necessary. On the present administrative record, this is not a proper case for invocation of the doctrine stated in Maxwell Dynamometer Co. v. United States, 181 Ct.Cl. 607, 631, 386 F.2d 855, 870 (1967).

22. The 75 days' delay claimed included seven days found by the Board to be excusable.

23. Prior to June 15, 1960, Mr. Cleary had occupied a similar position with Stewart-Warner Corporation.

the "time interval between the beginning of August and 5 September" 1960. Plaintiff's request for a "correlation" was properly refused, and a "collation of such magnitude" was unnecessary.

On September 5, 1960, plaintiff obtained the services of Mr. Holder, "a mechanical designer and expert on plans who had done the same job for Stewart-Warner." After August 25, 1960, plaintiff "called NAFI * * * and told them to disregard" the August 25, 1960, list, because "a better list, Holder's, was forthcoming." Mr. Holder "began releasing drawings on 12 September to the purchasing agent"; in two weeks he "correlated the GFP drawings into the essential, nonduplicated 1274, and identified the drawings of which the latest revisions were desired."

Mr. Holder "sent this list," i. e., "drawings of which the latest revisions were desired," to NAFI in a letter dated September 20, 1960, and received by NAFI September 27, 1960.[24] Mr. Holder "had just come from Stewart-Warner and knew or heard of some revisions out or in preparation of later date than the GFP drawings, which also contained indications of them." His letter of 20 September consequently states: "we *feel* that approximately 60 drawings are missing, chiefly on the indicator." (Emphasis by the Board.)

The Board also found that "the GFP plans were ready for release, or dumping," by September 20, 1960, within the "normal [30-day] interval," "except for the latest revisions"; that plaintiff "wanted the latest drawing revisions and was willing to wait for them * * *"; that the revisions requested by Mr. Holder reached plaintiff October 17, 1960; and that from "that date forward [plaintiff] had all the plans and in the shape it needed * * *." Finally, the Board

said, "We find that the GFP drawings as received by [plaintiff] were susceptible of checking and correcting by competent help into sets capable of being released for purchasing within a normal period of 30 days after receipt, and that such 30 days was not an excusable delay caused by the Government." This decision is, for reasons indicated below, "in error as a matter of law." H. L. C. & Associates Constr. Co. v. United States, 176 Ct.Cl. 285, 296, 367 F.2d 586, 592 (1966).

By the terms of its contract, plaintiff was obligated to manufacture a preproduction model conforming to "the detail design requirements, performance characteristics, tolerances, etc.," specified in applicable contract drawings, and also completely interchangeable with the GFP "equipment" furnished to plaintiff (as well as "with the latest model of any previously produced equipment").

Under the GFP clause and Schedule C, defendant was required to furnish, and plaintiff was entitled to receive and to use in the performance of its contract, a suitable set of "AN/APG–53A Drawings". And, harmonizing these two contract provisions and Specification MIL–R–21388, the Board properly held that the "contract drawings" consisted of a set of "drawings of the revisions last issued prior to 19 February 1960." Thus, at the outset at least, plaintiff's contract contained an ascertainable, and finite, drawings standard, and one with which plaintiff, and defendant, were both obligated to comply.

It is crystal clear, from defendant's continuing updating of the display package to an arbitrary, but unestablished, "cut-off date" for each of the separate components; from the post-February 1960 revision of all drawings for the indicator; from a July 8, 1960, letter

24. While the Board did not so find, attached to the September 20, 1960, letter were, *inter alia*, lists of drawings bearing the following notations: "We do not have the following but have reference to" (22 drawings); "the following are later revisions which we do not have but have

reference to" (28 drawings); and some 27 "discrepancies" between drawing revisions plaintiff should have received, according to a list given to it by NAFI August 2, 1960, and what it actually had (or in two instances, "did not receive").

from the Bureau of Naval Weapons to NAFI;[25] and from other evidence in the administrative record, that plaintiff did not receive GFP drawings conforming to that initial drawings standard. Instead, the GFP drawings theoretically included all drawings in effect on February 19, 1960 (and not superseded) plus every revision in the drawings between that date and the "cut-off date" for the particular component, and excluded all drawings superseded, either prior to February 19, 1960, or between that date and the cut-off date.[26]

Plaintiff strenuously contends that, after its receipt of GFP drawings, there was mutual if unwritten agreement to a joint "drawing correction and verification program reconciling and updating the GFP drawings to the latest revisions of the drawings available rather than the IFB drawing revisions," and mutual agreement that the components would be built to the "most current revision date" standard. Plaintiff argues that the Board wholly failed to consider this agreement, but contends that, tested by either IFB or most current revision date standard, the GFP drawings were unsuitable for their intended use.

While defendant's brief perforce and perfunctorily asserts that there is substantial evidentiary support for the Board's finding of suitability, its arguments reveal both a fundamentally different position, and the real thrust of the Board's "finding." *E. g.*, defendant asserts that there was a "tacit agreement that plaintiff would produce the radar units from the latest revision supplied in the data package supplied to plaintiff as the working drawings * * *"; that plaintiff "could build acceptable units * * * regardless of the revisions of any particular drawing you had"; that "any revision of any particular drawing could have been used to produce the equipment * * *"; that "whether plaintiff did or did not receive the latest revised drawings is immaterial * * *"; and that "it made no difference as to which revision was used."

Such a reading of the Board opinion is a valid one. The premise underlying the conclusion that the drawings plaintiff received were "suitable" is unstated but on analysis clear. The Board findings that plaintiff received GFP drawings *not* of the latest revision; that Mr. Holder "got them [the GFP drawings] into *dumpable* shape in two weeks," and that by September 20, 1960, the GFP drawings were ready for dumping *"except for the latest revisions"* (emphasis supplied), abundantly show that when the Board "found" the GFP drawings suitable for their intended use, the decision was, in essence, a holding that a set of drawings, of any revision of any generation, superseded or not, was "sufficient for contract performance", and fully satisfied defendant's contractual obligation to plaintiff.[27]

As defendant asserts, Mr. Hague, the inventor of the APG–53A, did testify that any revision of any drawing could be used to build a satisfactory product, and that he did not even regard as important whether or not the GFP package included drawings superseded by revision prior to February 19, 1960.[28] Defendant

---

25. NAFI was thereby instructed to ship to plaintiff a "reproducible set of latest issue drawings covering the complete Radar Set AN/APG–53A."

26. While there is evidence in the record that theory and practice did not coincide, the Board made no findings in this respect, nor did it treat the matter of a change in the applicable contract drawings standard. In the Board's view, these made no difference.

27. *Cf.* Ray D. Bolander Co. v. United States, 186 Ct.Cl. 398, 405, 415 (1968).

28. Defendant's witness Haines, in 1960 and 1961 NAFI's technical representative for supervising private industry APG–53A contracts, testified that he expected and wanted plaintiff's equipment to be built to NAFI's "latest revisions"; that both plaintiff and the Bureau of Naval Weapons knew of his desires and expectations; and that those "latest revisions" were necessary for plaintiff to build the equipment as NAFI wanted it built. Mr. Haines also testified that when he visited plaintiff's plant October 17, 1960, "the fact that they were still struggling with

also cites, as showing that "plaintiff, at all times, had adequate drawings * * *", an affidavit to the effect that Mr. Hague testified that the preproduction model "could have been produced * * * from a set of NAFI drawings o.f *any* revision after the date (1958) when the APG–53A concept was finished." (Emphasis supplied.)[29]

It would be foolhardy from a technical standpoint, and it is unnecessary from a decisional one, to question the validity of Mr. Hague's conclusion. For, the crucial issue here is not whether any drawing revision of whatever generation would produce as "satisfactory" equipment as a later revision of that drawing, but whether plaintiff timely received a set of APG–53A drawings "suitable for use" within the meaning of the GFP clause of its contract. As the Board's opinion demonstrates, that controlling issue was neither reached nor resolved.

A representation of suitability is "essentially a representation of the existence of a *fact*": that government-furnished property is, "on the whole, * * * fit for its intended purpose." Thompson Ramo Wooldridge Inc. v. United States, *supra,* 175 Ct.Cl. at 542, 361 F.2d at 232 (1966). But, this factual question must be "determined by reference to the requirements of the contract as a whole * * *." Preuss v. United States, *supra,* 188 Ct.Cl. at 482, 412 F.2d at 1300;

Thompson Ramo Wooldridge Inc. v. United States, *supra,* 175 Ct.Cl. at 544, 361 F.2d at 233; Topkis Bros. Co. v. United States, 155 Ct.Cl. 648, 297 F.2d 536 (1961), rehearing denied 155 Ct.Cl. 680, 299 F.2d 952 (1962).

The Board's conclusion that drawing revision status was wholly irrelevant resulted in a determination of suitability entirely apart from, not "by reference to," the requirements of plaintiff's contract. This ruling involved a decision on a question of law, not of fact, and is erroneous. Aerodex, Inc. v. United States, 189 Ct.Cl. 344, 417 F.2d 1361 (1969). The suitability of the GFP drawings must be determined in light of the applicable contract standard,[30] not abstractly and *dehors* contract terms. See Preuss v. United States, *supra,* 188 Ct.Cl. at 482, 412 F.2d at 1300, and cases there cited.

In the circumstances of this case,[31] plaintiff was entitled to GFP drawings reasonably accurate, complete, and consistent, when tested against the applicable contract standard. That, in the bright gleam of hindsight, any revision of any drawing would have produced "satisfactory" equipment is here irrelevant. The Board misapprehended defendant's obligation under the GFP clause, and accordingly failed to resolve the question whether the GFP drawings were suitable for use when considered in light of plaintiff's contract as a whole.

the drawings to get the latest revision was something that [he was] in sympathy with and fully understood * * *."

29. Mr. Hague personally thought it "certainly desirable", however, that plaintiff build to latest revision drawings.

30. It is clear that the original contract drawings standard was not met. Precise definition of defendant's obligation to plaintiff under the GFP clause (and other relevant contract provisions), and of the source—mutual agreement or otherwise—of changes in the original contract standard, should, however viewed in Wunderlich Act terms, be deferred. Other factual matters which may be important in defining that obligation remain to be considered administratively.

31. As the Board found, when plaintiff received the GFP drawings, it discovered that some of them "were not of the latest revision * * *." As the Board in effect also found, defendant was promptly (and repeatedly) advised that plaintiff was having considerable difficulty with the GFP drawings. There is no finding, nor showing, that defendant ever proffered plaintiff any reliable assurances that revision status was immaterial. Evidence that defendant wanted and expected "latest revision" equipment points to the opposite conclusion. *Cf.* John McShain, Inc. v. United States, 188 Ct.Cl. 830, 412 F.2d 1281 (1969); Allied Contractors, Inc. v. United States, 180 Ct.Cl. 1057, 381 F.2d 995 (1967).

Plaintiff contends that the court should find the GFP drawings unsuitable, fix the extent of delay thereby resulting, and hold the default termination legally erroneous. Defendant, at equal length, argues that the GFP drawings were in fact suitable. The Board disposed of plaintiff's claim of unsuitability on an erroneous legal conclusion and there is notable absence of crucial factual decisions upon which to base a substantial evidence review. Williamsburg Drapery Co. v. United States, 177 Ct.Cl. 776, 796, 369 F.2d 729, 740 (1966); Citizen Band of Potawatomi Indians v. United States, 179 Ct.Cl. 473, 492, 391 F.2d 614, 624 (1967), cert. denied 389 U.S. 1046, 88 S.Ct. 771, 19 L.Ed.2d 839 (1968). Cf. Emerson-Sack-Warner Corp. v. United States, 189 Ct.Cl. 264, 416 F.2d 1335 (1969). Accordingly, here, as on the claim of late delivery, the Board "will have to make the determination[s], either on the present record or after further evidence is produced." Bell v. United States, 186 Ct.Cl. 189, 206, 404 F.2d 975, 984 (1968); see also Koppers Co. v. United States, 186 Ct.Cl. 142, 150, 405 F.2d 554, 559 (1968).[32]

This disposition of Count I renders decision on Counts II and III premature, and consideration of these Counts is accordingly withheld.

Therefore, (1) plaintiff's motion for summary judgment is granted as to Count I; (2) defendant's cross-motion for summary judgment is denied as to Count I; (3) decision on Counts II and III of the petition is deferred; (4) defendant's counterclaim is dismissed; and (5) further proceedings herein are stayed, pursuant to (and subject to the terms of) Rule 167, for a period of six months to afford plaintiff an opportunity to obtain further administrative consideration on the issue whether, on January 13, 1961, plaintiff was in default.[33]

32. Since much of the Board record (including all oral testimony) antedates United States v. Carlo Bianchi & Sons, 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963) supplementation may well be

essential to a just decision. This matter, however, is for the sound discretion of the Board.

33. See notes 5 and 6, *supra*.